UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 24-20399-CR-GAYLES

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.

EFRAIN BETANCOURT, JR.,

        *Defendant.*

_____/

## EFRAIN BETANCOURT'S SENTENCING MEMORANDUM

**EFRAIN BETANCOURT** ("**MR. BETANCOURT**"), through undersigned counsel, respectfully submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553(a), and the dictates of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny.  In support thereof, **MR. BETANCOURT** submits the following:

### I.
### INTRODUCTION

Based upon a total offense level of 28 and a criminal history category of I, the Presentence Investigation Report ("PSR") calculates **MR. BETANCOURT'S** applicable guideline range at 78 – 97 months.  [ECF 45]. During **MR. BETANCOURT'S** change of plea hearing, the government confirmed that it would recommend a sentence at the low end of the guidelines at the time of sentencing in this matter. Accordingly, the instant Sentencing Memorandum serves to explain why a sentence below the guidelines range is "sufficient, but not greater than necessary" to serve the purposes of 18 U.S.C. § 3553(a).

**II.**
**NATURE AND CIRCUMSTANCES OF THE OFFENSE**

At the outset, **MR. BETANCOURT** fully accepts responsibility for his conduct in the operation and management of his company, Sky Group USA, LLC ("Sky Group"). He acknowledges that, despite his initial intentions, Sky Group ultimately evolved into an enterprise that defrauded investors and caused substantial financial loss. In light of this reality, **MR. BETANCOURT** made the decision to promptly plead guilty after reviewing the discovery in this case and consulting with counsel. Importantly, **MR. BETANCOURT** did not attempt to contest the government's expert findings, nor did he retain his own financial experts to challenge the government's conclusions. He declined to do so because he accepts the financial loss calculations and is genuinely remorseful for his role in the offense.

Nevertheless, it is relevant for this Court to understand how **MR. BETANCOURT** came to be before Your Honor for sentencing. His introduction to the payday loan industry was the result of personal misfortune: while recovering from an accident in Venezuela, **MR. BETANCOURT** encountered a book highlighting the profitability of payday lending. Inspired by this business model, **MR. BETANCOURT** and his then partner, Carlos Mendoza, founded Beme Corporation in approximately 2013. For six to seven months, Beme Corp. issued small-volume, short-term loans without soliciting outside investment. The business was entirely self-funded and modestly profitable. Mr. Mendoza reports that in nearly 12 years of knowing and collaborating with **MR. BETANCOURT**, he "always demonstrated integrity, professionalism and a remarkable ability to manage both personal and financial matters with intelligence and discipline." Copies of Sentencing Letters written on **MR.**

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

BETANCOURT'S behalf, including a letter from Mr. Mendoza, are attached hereto and incorporated by reference herein as Exhibit № 1. *See* Transcript of Sentencing Hr'g at 93, *United States v. Sencan et al.*, Case No. 13-0117-WS (S.D. Ala. May 29, 2014) (Varying from guidelines of 135 – 168 months, and sentencing a defendant convicted at trial of running a ponzi scheme to 60 months imprisonment because the defendant's lack of criminal history points and employment history leading up until the scheme began indicated that the defendant was productive and leading a law-abiding life.) *aff'd*, 629 Fed. App'x 884, 892 – 93 (11th Cir. 2015) ("Further, we conclude that a 60–month sentence was reasonable no matter the Guidelines range. In fact, the district court considered all the relevant factors under 18 U.S.C. § 3553(a) and made findings supported by the record. Based on these findings, the resulting below-Guidelines sentence of 60 months' imprisonment was within 'the range of reasonable sentences dictated by the facts of the case.'") (internal citations omitted)

Encouraged by that early success, MR. BETANCOURT founded Sky Group in March 2015 with the intention of scaling his experience into a sustainable business. He initially funded the company using his personal savings and proceeds from the sale of assets. *See* Interview of Angelica Betancourt, dated June 11, 2024.[1] As with Beme Corp., Sky Group initially operated without any investor funds, generating enough revenue to sustain its operations. *Id.* The idea of bringing in outside capital only arose when a friend independently approached MR. BETANCOURT about the possibility of investing. *Id.*

---

[1]    Angelica Betancourt was married to MR. BETANCOURT at the time that he opened Beme Corp. and Sky Group, although they are presently divorced. Angelica Betancourt was employed with Sky Group and received a Kastigar Letter in relation to the instant proceedings.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

According to Angelica Betancourt, Sky Group had a strong early repayment rate, she estimated that approximately 90 out of 100 clients repaid their loans on time. *Id.* This data reinforced **MR. BETANCOURT'S** belief in the underlying viability of the business and encouraged him to consider the idea of scaling up through investor capital. During this early period, approximately 6 months before the start of the charged conspiracy, Sky Group was operating legitimately and generating revenue.

In an effort to safeguard the long-term health of Sky Group and reduce default rates, **MR. BETANCOURT** invested heavily in a multi-layered loan verification system. The verification process was designed to ensure that loans were only issued to applicants with verified, stable employment and banking history. This four-step process included:

1. Initial Disqualifiers: Screening applicants for factors such as unstable employment, age, receipt of government benefits, and other markers of repayment risk.

2. Alternative Credit Reports: Obtaining short-term credit data through reputable bureaus such as FactorTrust (now TransUnion), which assessed banking behavior and verified identity information.

3. Bank Verification: Requiring 90 days of bank statements to identify insufficient funds or delinquency, and to verify direct deposits or payroll consistency.

4. Employment Verification and Loan Adjustment: Confirming employment through direct contact with employers, followed by adjustments to loan amounts as necessary based on verified income.

This process was costly and time-intensive, requiring software, licensing, and human labor. Yet **MR. BETANCOURT** viewed it as a necessary investment to reduce defaults and preserve the integrity of his business. His efforts stand in contrast to defendants in other

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

Ponzi cases who made no meaningful attempt to establish or maintain a legitimate and functioning business. Put differently, if **MR. BETANCOURT** intended to defraud his investors and pocket their investments without performing on his loan business at the inception, why would he invest money and time implementing this robust process?

It is undisputed that Sky Group was not merely a façade for fraudulent activity. According to the government's own figures, Sky Group issued approximately $12,164,182 in loans and earned $20,711,119 in loan revenue. While those numbers are not proportional to the funds raised from investors, they demonstrate that Sky Group did, in fact, conduct the very business it purported to engage in, unlike many Ponzi schemes in which no legitimate activity occurs at all.

As the Eleventh Circuit explained in *United States v. Orton*, Ponzi schemes occupy a spectrum of fraud:

> at one end of the scale would be theft-like fraud where the perpetrator intends to keep the entire amount fraudulently obtained. On the other end of the scale would be contract fraud where the perpetrator, while fraudulently obtaining the contract, intends to perform the contract and to cause no loss to the victim. A Ponzi scheme falls somewhere in between.

*United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996) (internal citations omitted). We respectfully submit that **MR. BETANCOURT'S** case falls closer to the "contract fraud" end of this spectrum. Unlike defendants who operated from inception with fraudulent intent or offered nonexistent goods or services, Sky Group conducted real business activity before and during the charged conduct. *Compare Harned v. United States*, 511 Fed. App'x 829 (11th Cir. 2013) (ponzi scheme conviction where defendant sold promissory notes with no source of income other than investor funds); *United States v. Christou*, 334 Fed. App'x 950, 951 – 52 (11th Cir. 2009) (ponzi defendant "never made any bridge loans. . . nor did

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

he ever intend to"); *United States v. Molina*, No. 13-20416-CR-SCOLA, 2020 WL 3489540 (S.D. Fla. June 26, 2020) (ponzi defendant promised victims high interest checking accounts and investments, but never invested any of their money); *United States v. Mullens*, 65 F.3d 1560 (11th Cir. 1995) ("Omni had no assets other than the money invested by the victims; it generated no business profits except for some minimal rental revenue."); *United States v. McClintock*, 769 Fed. App'x 843 (11th Cir. 2019) (Ponzi defendant with prior criminal history sentenced to 120 months, with guidelines of 151 – 188 months, where the defendant raised over $20 million from over 220 investors over the course of nine years and made zero legitimate investment or economic activity).

The key distinction here is that Sky Group operated and issued real loans to real borrowers. While MR. BETANCOURT does not deny that his later conduct meets the elements of a Ponzi scheme, his business did not begin as one. His early actions, including personal financial investment and implementation of a rigorous loan verification system, reflect an intention to build a legitimate enterprise, not to defraud.

In sum, MR. BETANCOURT'S conduct should be viewed in the broader context of how Sky Group began, the nature of its early operations, and his intent at inception. While he accepts full responsibility for the evolution of the business into a fraudulent enterprise, the fact that Sky Group provided real services and was not designed from the start to deceive investors is relevant to his culpability. The sentencing guidelines do not differentiate between defendants who start businesses with fraudulent intent and those whose legitimate enterprises later devolve into fraudulent schemes. But this Court may, and should, consider that distinction under 18 U.S.C. § 3553(a). MR. BETANCOURT'S case falls into the latter category, and that difference in degree of culpability, we respectfully

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

submit, warrants a downward variance.

### III.
### MR. BETANCOURT'S HISTORY AND CHARACTERISTICS

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x. 93 (2d Cir. 2008). That principle is not merely aspirational; it is embedded in federal law. Congress has expressly required courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As the Supreme Court has repeatedly emphasized, "[h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); see also *Wasman v. United States*, 468 U.S. 559, 564 (1984).

MR. BETANCOURT'S life has been defined by sacrifice and premature responsibility. He was born in Venezuela to Efrain Betancourt and Luz Jaramillo and enjoyed, what he describes as a loving childhood with his younger sister, Angela Pritchett. However, MR. BETANCOURT was exposed to the vices his father at a young age, including his abuse of alcohol and narcotics and an uncontrollable gambling addiction. When MR. BETANCOURT was 10 years old, his father disappeared from his family's life for nearly two months. This forced MR. BETANCOURT to assume adult responsibilities as the remaining "man" in the

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

family, supporting his mother and six-year-old sister. And, while **MR. BETANCOURT** desperately desired his father's presence and comfort, his return was equally devastating to his family and overall stability as a 10-year-old child. In that moment, his father revealed that he had mortgaged their family home and confessed the true depths of his gambling addiction – they had lost everything.

Left with no option but to leave Venezuela and start a new life, **MR. BETANCOURT'S** parents abandoned their lives, including family and friends, in Venezuela, and relocated to the United States. **MR. BETANCOURT** recalls the difficulties he encountered as a 10-year-old child in the United States, namely the language barrier and cultural differences that resulted in bullying and isolation during his formative years. His parents' instability resulted in frequent moves that not only impacted his ability to forge meaningful friendships and ties to his community but also resulted in his placement in an alternative school, designed for children with behavioral and academic deficiencies. **MR. BETANCOURT'S** sister and mother describe this difficult time during their childhood:

> We moved to this country from abroad without a real plan and without knowing anyone. Although our parents did their best to provide for us, Efrain and I had to grow up quickly. By the age of 15, we were both working to help support the family. There were opportunities and freedoms we missed out on when it came to just being kids, things many take for granted. We were making decisions we had no business making at that age: translating for our parents, navigating paperwork, interpreting medical information, and acting as decision-makers in our household. The weight we carried as teenagers was comparable to what many people don't experience until their mid-20s after college. Life placed heavy responsibilities on us early on, more than it seemed to ask of others our age. There were times I questioned why our path felt more difficult. But through every challenge, Efrain reminded me I wasn't alone. His presence was my reassurance, and my anchor.

*See* Exhibit № 1, Letter by Angela Pritchett.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

> When we immigrated from Venezuela, it was Efrain—only 10 years old—who took on the burden of helping our family leave our home country that had become an unsafe situation. As a child and teenager, he should have been free to focus on school and play, but instead, he helped financially support our household, sacrificing experiences that most teens get to enjoy. He never complained and he simply did what he could, always giving more than what was asked. In many ways, Efrain kept our family going during the hardest times. I will never forget how much he carried on his young shoulders.

See Exhibit № 1, Letter by Libia Jaramillo.

Despite his struggles and less than fortunate upbringing, **MR. BETANCOURT** was driven by a passion and an innate instinct to help others in their difficult times. **MR. BETANCOURT'S** aunt and sister-in-law describe his support as they navigated difficult stages in their life:

> When I first arrived in the United States, it was my sister Luz and her family who welcomed me into their home—and Efrain, even as a teenager, always made sure I felt supported and cared for. He was constantly attentive to how I was feeling, asking if I needed anything or missed anything from back home. One day, he came home and said, "Tía, I found you a job so you can keep moving forward and continue supporting your children." I will never forget that beautiful gesture. Efrain extended his hand to help me when I needed it most, without hesitation or expectation.

See Exhibit № 1, Letter by Luz Jaramillo.

> There was a particularly painful stage in my life where family tensions made me feel isolated, rejected, and even misunderstood within my own environment. In that dark time, when it was easier to look away, Efraín chose to approach me with compassion, without prejudice or conditions.
>
> His presence in those moments was more than a consolation; It was kind of an emotional lifeline. He was the only person who made me feel seen, heard, and welcomed. He was under no obligation to do so, but his generous heart could not tolerate the pain of others. Despite having met me recently, he defended me firmly, gave me a place at the table and, with his simple gestures, a kind word, a smile, a hug in time, he achieved what seemed impossible: to begin to heal divisions that had been open for years.

See Exhibit № 1, Letter by Aniuska Diazgranados. Similarly, a close friend describes his

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

invaluable support as she navigated a postpartum crisis:

> Efraín is an intelligent, loving, and deeply God-fearing man. At a very difficult time in my life, when I was going through a postpartum crisis, he and his wife were there to accompany us. They counseled my husband and me, offered words of encouragement, and always reminded us that storms are temporary. His accompaniment was essential to overcome that stage.

*See* Exhibit № 1, Letter by Martha Elizabeth Peralta Montoya. **MR. BETANCOURT'S** brother-in-law summarized the same sentiment:

> Efrain has always been that quiet, steady support for his family—the one people turn to, lean on, and rely on. That's the role he's played consistently, and in his absence, the void is undeniable. And yet, even in this dark and painful chapter of his life, Efrain has continued to lead with faith. He has been helping others by teaching the word of God while being held. Even in the hardest times, he finds a way to shine light on others—just as he always has.

*See* Exhibit № 1, Letter by Ryan Pritchett.

    **MR. BETANCOURT'S** exemplary character and integrity are likewise attested to by professionals that have interacted with **MR. BETANCOURT**:

> Beyond his interactions with me, I was consistently impressed by Efrain's strong work ethic and the amount of time he spent at the office working and his exemplary consideration and respect for others, regardless of their position. He was invariably kind, courteous, and respectful towards my secretaries, support staff, and interns. He treated everyone in my office with the same dignity he extended to me, remembering names, asking about their well-being, and expressing sincere gratitude for their assistance. This was not an act; it was a consistent reflection of his character.
>
>       . . .
>
> Your Honor, the actions for which Efrain stands before you are serious, and he understands the gravity of the situation. However, the man I have known for 12 years is not defined solely by these mistakes. He possesses a fundamentally decent character marked by honesty, self-awareness, a drive for self-improvement, deep respect for others regardless of status, genuine kindness, strong family values, and a desire to contribute positively. His actions aside from this case demonstrate an inherent sense of fairness and empathy that seems incongruent with this crime he committed, suggesting the conduct before this Court was an aberration.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

*See* Exhibit № 1, Letter by Menachem M. Mayberg, Esq.

> I have known Efrain since approximately, 2011. Throughout this entire period, I have consistently found him to be a fundamentally kind, courteous, and a respectful individual. He treats everyone he encounters, regardless of their background, position, or stature, with decency and consideration. This inherent respectfulness is one of his defining characteristics.
> . . .
>
> I am, of course, aware of the serious nature of the charges for which Efrain stands before you and the harm caused. I want to emphasize that in our conversations following these events, he has expressed profound remorse. He has spoken to me specifically about his deep regret for the victims' losses and the pain caused by his actions. He understands the wrongfulness of what he did and the impact it has had on others. This remorse appears to me to be genuine and deeply felt.

*See* Exhibit № 1, Letter by David Seltzer, Esq.

> While my relationship with Efrain began as a business relationship, and unlike most business relationships, he made a conscious effort to build upon and expand that relationship.  In that regard, Efrain was the kind of person who would just pick up the phone call, not because he needed something, but because he wanted to see how I was doing.  Efrain had nothing to gain by reaching out to me to see how things were going, but that is who he is. I found Efrain to be someone that genuinely cares about others.  Efrain also demonstrated that he was committed to keeping his word and improving himself.  In that regard, I watched Efrain graduate from law school and obtain his Juris Doctor degree.  I think most people would have given up on that idea after 2021, but that is not Efrain.

*See* Exhibit № 1, Letter by Robert Harris, Esq.

> I had the opportunity to meet Mr. Betancourt when I worked with him as his real estate agent. He was facing a foreclosure at the time, and I assisted him through that difficult situation.
>
> Throughout our professional relationship, Mr. Betancourt demonstrated honesty, transparency, and professionalism. He was respectful, courteous, and consistently clear in his communication. He handled a very challenging time with grace and integrity, which left a lasting impression on me.

*See* Exhibit № 1, Letter by Denise Grillo, Licensed Realtor.



*MR. BETANCOURT delivering donations, including diapers and non-perishable food items to individuals affected by Hurricane Dorian in the Bahamas.*

Consistent with the beliefs of those closest to him, **MR. BETANCOURT** also demonstrated his selfless character and charitable personality to those to whom he had absolutely no relation. For example, in the aftermath of Hurricane Dorian in 2019, **MR. BETANCOURT** used his private pilot license to fly to the Bahamas and deliver desperately needed humanitarian aid to isolated Bahamian Island communities on approximately six different occasions. **MR. BETANCOURT** single-handedly organized and executed the trips that delivered food, toiletries, and clothes to those who were stranded and left with nothing after the hurricane. Logistically, **MR. BETANCOURT** oversaw every aspect of the donation effort. He personally received contributions at the Sky Group office, paid out-of-pocket for airplane fuel and landing fees necessary to fly to the Bahamas, and secured governmental clearance from Bahamian authorities for each trip. Upon arrival, he hand-delivered the donations to the island. Notably, **MR. BETANCOURT** took deliberate steps to ensure that aid reached those in greatest need, not through established charities or organizations, but by directly coordinating with individual Bahamian citizens. His connection to the island was longstanding; prior to founding Sky Group, **MR. BETANCOURT** had vacationed in the



*A Bahamian citizen retrieving the donations that MR. BETANCOURT flew into the island on one of his many trips.*

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

Bahamas and developed lasting relationships with local residents and staff he met during his visits. He maintained contact with these individuals over time and later relied on them to personally collect and distribute the donations to the most vulnerable members of the community.

While **MR. BETANCOURT** served as a pillar of support and empathy to many, he nevertheless faced significant challenges in his adulthood. In or around 2018, **MR. BETANCOURT** and his wife, Leidy Badillo, began what can only be described as a painful, frustrating and emotional journey to expand their family. After struggling for several years to naturally conceive a child, which efforts proved unsuccessful, they turned to fertility testing and invasive treatments. Determined to create a family of their own, **MR. BETANCOURT** and his wife, temporarily relocated to Colombia to begin the *in vitro* fertilization ("IVF") process. Despite their best efforts, they suffered one (1) unsuccessful implantation and one (1) miscarriage. **MR. BETANCOURT'S** wife describes the traumatic experience and **MR. BETANCOURT'S** unwavering support:

> I lost my father when I was 7 years old, and since then I knew what it was like to long for a present figure. My biggest dream was to form a home where my children could grow up with both parents, and with solid values. After stumbling blocks before meeting Efraín, I had given up on the idea of being a mother. The people who came into my life did not share the values necessary to take on the challenge of forming a family responsibly. But then came Efraín.
>
> In 2023, despite all the circumstances experienced and the challenges faced, we became pregnant. However, at three months, our daughter's heart stopped beating. It was a devastating blow. Without realizing it, I fell into a deep sadness, a silent depression from which I only emerged embraced by God's love and by the constant presence of Efraín. He was my anchor. But over time I understood that, while he was holding me, he himself was withering inside.

*See* Exhibit № 1, Letter by Leidy Badillo. Close family and friends that witnessed the

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

devastating loss share their observations of this challenging time:

> I have witnessed the deep longing he and his wife have had to start a family, and their tireless efforts to have the child they so eagerly awaited. I remember the day they shared the news that they were going to be parents—their eyes sparkled with joy, and their faces radiated immense happiness.
>
> Sadly, that dream faded with the loss of their baby. I saw how, despite his own grief, he stood strong to support his wife, offering her encouragement and love during such a devastating time. Behind that strength, however, was a deep sorrow and an internal struggle with his faith. Over time, Efraín found forgiveness and reconciliation with God, and he channeled his pain into service: he began leading groups for vulnerable men, sharing his story and motivating them to become better people, showing them that the past does not define the future.

*See* Exhibit № 1, Letter by Ingrid Oviedo.

> I remember with immense joy the day they shared the news that they were expecting a baby. I felt like the happiest grandmother in the world. He was a son deeply desired by two responsible and wonderful people. I could only thank God.
>
> I also remember with pain the moment when they lost it after so many attempts. It was a devastating blow for everyone. Seeing the suffering of my daughter and Efraín was profoundly heartbreaking. However, it was moving to see how that pain transformed him. Efraín used it to cling even more to God and allowed that wound to become a source of purpose. That moment marked the beginning of a profound calling in his life: to help men restore their God-given authority as priests of their homes, to save marriages and restore entire families, giving back to many children the opportunity to grow up in homes filled with love, faith and hope.

*See* Exhibit № 1, Letter by Blanca Badillo.

MR. BETANCOURT and his wife have not given up on their dream of building a family together. Childrearing is biologically time-sensitive and deeply personal to MR. BETANCOURT and his wife. Naturally, an extended term of imprisonment, particularly within the guidelines range, will have the effect of severely diminishing, if not eliminating altogether, their ability to conceive due to MR. BETANCOURT wife's age. MR. BETANCOURT'S

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

mother-in-law pleads to this Court:

> Honorable Judge, I still dream of my grandchildren, and I ask God—and today you as well—to grant us the opportunity to see Efraín again in our home, and that we may soon be able to embrace that baby we long for. Because of my daughter's age, time is an important factor so that there is still the possibility that they can form that family they want so much.

*See* Exhibit № 1, Letter by Blanca Badillo.

IV.

**MR. BETANCOURT'S EFFORTS TOWARDS REHABILITATION**

For **MR. BETANCOURT**, the journey towards rehabilitation began with a harsh and deeply personal reckoning. Admittedly, at first it was extremely difficult for **MR. BETANCOURT** to come to terms with his conduct and the fact that despite his initial intentions, he engaged in what is appropriately described as fraudulent conduct. He was confronted by a series of civil lawsuits, the Securities and Exchange Commission ("SEC") action that preceded the instant criminal case, and a slew of publicity that identified his family and others close to him long before his arrest in the instant case.[2] However, once he came to terms with this reality, he was overcome with anguish, shame, and disappointment, and chose to resolve the SEC matter quickly, [ECF 45 ¶ 43], consenting to the entry of a final judgment and stipulating to a fine of $6,183,951, which will be owed in addition to the $8,300,000, forfeiture order that he consented to, [ECF 46 and 47], and

---

[2]    To name a few, the Miami Herald, Newsweek, CBS News, Latin Times, the Business Journal, Daily Mail, and other local news stations in Miami and Venezuela alike published stories naming **MR. BETANCOURT** and his family. And, while **MR. BETANCOURT** understands why his conduct generated publicity, the media coverage went beyond the facts of the case and speculated and accused churches and other individuals of involvement in **MR. BETANCOURT'S** case, which was patently false and caused serious reputational damage to all so identified. *See United States v. Vigil*, 476 F.Supp. 2d 1231, 1314 (D.C.N.M. 2007) (recognizing that the defendant "has suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case.")

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

the restitution figure that will be imposed as part of his sentence in the instant case. *See United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming downward variance for defendant convicted at trial of insider trading and money laundering because the district court "specifically addressed other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission. . ."); *United States v. Redemann*, 295 F.Supp. 2d 887 (E.D. Wis. 2003) (pre-*Booker*, granting downward departure for defendant convicted of conspiracy to commit bank fraud and obstructing the examination of a financial institution on the basis that the "purposes of sentencing were at least partially achieved prior to the initiation of th[e] prosecution" by the civil case through the Office of the Comptroller of Currency resulting in a restitution and fine order of $175,000 and adverse publicity.)

While it was difficult for MR. BETANCOURT to express these sentiments given the plethora of cases and litigation that ensued, those closest to him witnessed the raw and genuine remorse that plagued his every thought and being since the inception of the corporate crisis and related litigation:

> I clearly remember a conversation during a moment of deep vulnerability. It was painful to hear from his own mouth that, overwhelmed by everything he was facing, he expressed that he would rather die than see so many people affected. From the depths of our hearts, we know that those words came from a man who always seeks to solve problems, help, and support others. When he saw that the situation was slipping out of his hands and that he could not fix everything as he would have wanted, he broke down. That moment marked me because I saw a sincere man, carrying an enormous weight in his heart, but also someone willing to acknowledge that he could no longer continue on his own.

*See* Exhibit № 1, Letter by Dena Carrasquillo.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

Having acknowledged that he could no longer rely on his own strength, **MR. BETANCOURT** found solace in his faith. He became involved with a global religious group, *Legendarios*, which seeks to spread the word of Jesus Christ through meetings, community service opportunities, and mission trips. Relevantly, the religious group also seeks to empower the growth of its members by encouraging them to confront their wrongdoings, missteps, and transgressions. Pastor Harold Navarro, a member of the group recounts **MR. BETANCOURT'S** deeply personal involvement in the group's mission:

> I particularly remember an encounter in the mountains, during a Legendary experience, in which more than 150 men began a process of reconnection with God and with their true masculinity. In the midst of difficult situations, including an unexpected storm, I observed in Efraín an admirable emotional control and an unwavering willingness to support others. I saw him be vulnerable, offer a hug, a word of encouragement and a safe space for those who were going through critical moments. Her leadership was key in that space of transformation.

*See* Exhibit № 1, Letter by Harold Insignares Navarro. While he initially began as a volunteer and member, **MR. BETANCOURT** later assumed leadership responsibilities within the group and initiated additional programs to further the group's mission. In fact, **MR. BETANCOURT** served as a mentor to several of the members in the group and took the initiative to establish a weekly prayer gathering aimed at offering spiritual support and guidance to those facing personal challenges. What began as a modest assembly gradually grew into a vibrant community of nearly 80 individuals, united by a shared commitment to personal growth and the advancement of their broader community. One of his mentees describes **MR. BETANCOURT'S** profound impact:

> The "Eagles" prayer group, which he founded, continues to meet every Wednesday morning to pray. In addition, he was the one who led a beautiful initiative to give a guide dog to Edwin, a young man with a visual impairment, demonstrating his ability to mobilize wills for noble causes.

Page 17 of 21

*See* Exhibit № 1, Letter by Yonathan Smith Castellar Ortiz. **MR. BETANCOURT** also participated in community service events through the group. For example, on several occasions, the group hosted outreach efforts to prepare and distribute food in the streets of Colombia to individuals facing homelessness and underprivileged families. During these events, the group set up formal dining areas and prepared hot meals on-site, creating a dignified and welcoming atmosphere for underserved individuals who might otherwise go without such experiences.

*Mr. Betancourt serving meals to the homeless and underprivileged families.*

During his time of incarceration at FDC Miami, **MR. BETANCOURT** continued to pursue his calling and sought to make a positive impact in the lives of other inmates, some of whom were pending trial or had been sentenced for serious, violent crimes, and facing lengthy terms of imprisonment. Specifically, **MR. BETANCOURT** preaches at the chapel in FDC Miami every day to a group of approximately 15 inmates. He is referred to as the unit's "Pastor" providing words of encouragement, prayers, and biblical teachings to other inmates, focusing on themes of forgiveness and second chances. An inmate who attends **MR. BETANCOURT'S** services relays:

> My personal past has been filled with violence, and bad influences. As Mr. Betancourt puts it "generational chains." Upon meeting Mr. Betancourt who is the pastor for the unit, he has taken the time to mentor me, listen to me, and guide me to meeting the best person I have yet met. Jesus Christ.
>
> Mr. Betancourt's words of wisdom, his daily services, and his guidance has led me to think about my past and future in a different way. Thanks to him, I have now applied to study Theology and get my B.S. degree through correspondence and he has been an inspiration to me, one that I want to

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

pass on to others so that they seek of Jesus and not end up in the same situation as me.

I really appreciate and admire that Mr. Betancourt has taken the time to put the needs and serve others he didn't know while going through one of the worst chapters of his own life himself.

He has pushed me to establish family relationships and to become a better man, to be an example in the future to my grandson.

*See* Exhibit № 1, Letter by Francisco Rangel, Inmate at FDC Miami.

In addition to his pastoral calling within FDC Miami, **MR. BETANCOURT** has also consistently and continuously worked in the food services department while in custody. His impeccable disciplinary history and character has also earned him the title of orderly on his unit. **MR. BETANCOURT'S** efforts towards rehabilitation and selfless conduct while imprisoned reflect an individual that is truly remorseful for his conduct and recognizes his responsibility to do better. It is also consistent with the Supreme Court's recognition that a defendant's post-incarceration conduct is pertinent to the defendant's history and characteristics, the need for the sentence imposed to serve the general purposes of sentencing, and "a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary,' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper*, 562 U.S. at 491; Transcript of Sentencing Hr'g at 15, *United States v. Anor*, No. 17-cr-80080-BB-2 (S.D. Fla. May 17, 2019) (Varying from guidelines of 27 – 33 months and imposing a sentence of 24 months for defendant convicted of preparing fraudulent federal income tax returns, emphasizing defendant's rehabilitative efforts while in custody, and reasoning in part "the events that took place over the course of a long period of time caused harm and certainly were significant; however, I believe that it is the Court's responsibility to take into consideration where you

are now."); *United States v. Robertson,* 662 F.3d 871 (7th Cir. 2011) (Recognizing that the defendant's relevant sentencing factors, including rehabilitation, looked much different at the time of sentencing, than it did at the commission of the crime).

## v.
## SENTENCING DISPARITIES

The United States Sentencing Commission's "Interactive Data Analyzer" (hereinafter referred to as "IDA") is an online tool, which allows users to filter and customize the most up-to-date federal sentencing data based on a variety of factors including, fiscal year; geography; defendant demographics; crime type; primary guideline; sentencing zone; and criminal history.  After inputting the factors most relevant to **MR. BETANCOURT'S** case[3], the IDA produced the following sentencing outcomes:

— Distribution of Sentence Length: 48.4% of the defendants were sentenced to a term of imprisonment of 24 months or less; 37.1% of the defendants were sentenced to a term of imprisonment of 24 to 59 months; 11.2% of the defendants were sentenced to a term of imprisonment of 60 to 119 months; and 3.4% of the defendants were sentenced to a term of imprisonment of 120 months or longer.

— Average Sentence Length and Imprisonment Length: 32 months.

— Median Sentence Length and Imprisonment Length: 24 months.

A copy of the sentencing outcome distribution charts produced by the IDA after inputting the sentencing factors are attached hereto and incorporated by reference herein as Exhibit № 2.  We respectfully submit that a below guidelines sentence is warranted to

---

[3]     Fiscal   Year:   2015-2024;   Geography:   National;   Crime   Type: Fraud/Theft/Embezzlement; Primary Guidelines: § 2B1.1; Sentencing Zone: D; Criminal History: I.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

avoid sentencing disparities between **MR. BETANCOURT** and sentences imposed at a national level.

## VI.
## CONCLUSION AND PRESERVATION OF ARGUMENTS

We respectfully request that this Court vary downward and impose a sentence below the guideline range of 78 – 97 months. Further, **MR. BETANCOURT** respectfully reserves the right to supplement the instant Sentencing Memorandum at the time that the final PSR is filed with the Court regarding additional information omitted from the draft PSR.

Respectfully submitted,

**RABIN & LOPEZ, P.A.**
One Southeast Third Avenue
Suite 2600
Miami, FL  33131
Tel:  305•358•1064
Email:  sjr@miamilawyer.com

*s/  Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.
Florida Bar № 273831

*s/  Jessica Duque*

JESSICA DUQUE
Florida Bar № 1031237

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August 2025, a true and correct copy of the foregoing Sentencing Memorandum was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.

---

Sentencing Memorandum
Page 21 of 21